[Cite as *State v. Ayers*, 2022-Ohio-1910.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. Earle E. Wise, P.J. |
|  | : | Hon. W. Scott Gwin, J. |
| Plaintiff-Appellee | : | Hon. William B. Hoffman, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2021CA00134 |
| KAYLA AYERS | : |  |
|  | : |  |
| Defendant-Appellant | : | OPINION |

CHARACTER OF PROCEEDING: Crimina appeal from the Stark County Court of Common Pleas, Case No. 2012-CR-1567

JUDGMENT: Affirmed

DATE OF JUDGMENT ENTRY: June 6, 2022

APPEARANCES:

For Plaintiff-Appellee

KYLE L. STONE
Prosecuting Attorney
BY: VICKI L. DESANTIS
Assistant Prosecutor
110 Central Plaza South, Ste. 510
Canton, OH 44702-1413

For Defendant-Appellant

BRIAN  HOWE
Ohio Innocence Project
PO. Box 210040
Cincinnati, OH 45221

*Gwin, J.,*

{¶1}     Appellant Kayla Jean Ayers ["Ayers"] appeals from the November 2, 2021 Judgement Entry of the Stark County Court of Common Pleas overruling her motion for a New Trial and her Petition for Post-Conviction Relief without a hearing.

*Facts and Procedural History*

{¶2}     Before the fire on the evening of October 3, 2012, Ayers and her family (her boyfriend and their three young children) were living with her father and his family (his girlfriend and her two children) in his Massillon residence.  2T. at 307-312[1].  Her father, Jeff Ayers, eventually discussed finances with Ayers and the fact that she was not contributing much toward the household expenses.  Their relationship deteriorated due to the financial situation, and Mr. Ayers told his daughter to leave and care for her own family.  Ayers responded by telling her father that she was not leaving and that he should leave.  Ayers then threatened to burn the house down.  Fearful for himself and his pregnant girlfriend, Mr. Ayers decided to leave and force Ayers to care for her family on her own.  When he told his daughter of his decision, Ayers threatened to burn the house down if he were to leave.  Id.   At the time of this threat, a friend of Mr. Ayers, Jason Pandrea (who was having a sexual relationship with Ayers), overheard Ayers's threat.  Mr. Ayers decided to leave the Massillon home nonetheless, and left for West Virginia to seek employment and new living arrangements during the morning of October 3, 2012.  2T. at 307-321; 339.

{¶3}     On October 3, 2012, Ayers's boyfriend, Brennan Scott, left for work as usual, picking up his boss on the way.  2T. at 325-376.  After work, he picked up Ayers and then

---

[1] For clarity, the transcript from Ayers's jury trial on January 28, 29, and January 30, 2013   will be referred to as, "__T.__," signifying the volume and the page number.

went to get their children from day care around 6:30 p.m.  2T. at 327.  Scott then took his boss and his boss's children home to Beach City, where Scott stayed for a couple hours socializing.  2T. at 327-328.  Two of Ayers's children, the daughters, who were 5 and 4, boarded a church bus to take them to evening services around that time.  2T. at 327.  When Brennan Scott returned around eight o'clock that night, he found fire trucks around his house.  2T. at 328.

{¶4}    Karen Ball, a regular attendee at this church, arrived at the Ayers residence in order to pick up Ayers and her three children.  2T. at 376-377.  Ball knocked on the front door, but no one answered the door.  Id. at 378.  Instead, she heard the dog barking, and then heard someone say, "Shhh."  2T. at 378-379.  Getting no answer, Ball went to the kitchen door.  2T. at 379.  Ball was able to see Ayers's purse and a backpack on a chair on the deck.  2T. at 379.  Ball talked briefly with a neighbor, which led her to believe that Ayers was inside the home.  2T. at 380-381.

{¶5}    While at church, Ball decided to leave the service early to check on Ayers. 2T. at 381.  Arriving at the home around eight o'clock, Ball noticed a flickering emanating from a basement window.  2T. at 381-382.  Ball knocked on the basement door, but got no answer other than the dog barking.  Ball called to Ayers repeatedly, but got no answer. 2T. at 383.  She went once again to the kitchen door to knock and call to Ayers.  Still getting no answer other than the dog's persistent barking, Ball returned to her car to get her cane, after which she intended to go to a neighbors to ask about Ayers.  2T. at 384. When she got to her car, she heard a thump, turned around, and saw Ayers running to her with her youngest child, three-year- old Bubba (Brennan, Jr.).  2T. at 384-385.  Ayers told Ball to call 9-1-1, so the disabled woman went to the neighbors' and had them call 9-

1-1. 2T. at 385-386. While waiting for the fire fighters to respond, Ball stayed with Ayers and Bubba. She noticed that Ayers had cut her hand, but that Bubba was fine. 2T. at 386. Ayers also kept bemoaning the fact that she was going to lose her children. 2T. at 389.

{¶6} The neighbor, Jennifer Conley, heard Ayers say that Bubba had started the fire. Conley detected a strong odor of burnt marijuana on Ayers. 2T. at 359-360, 362, 367.

{¶7} Fire fighters from the Massillon Fire Department responded to the 9-1-1 call, and put out the fire inside the home. Once the fire was extinguished (primarily in the basement), the smoke inside the home was ventilated out, which then allowed the fire inspector to investigate the nature and origin of the fire. The fire fighters-paramedics also treated Ayers and her lacerated hand, as well as Bubba. The paramedics noted that Bubba did not have any smoke smell or soot about him; Ayers, however, had soot on her, which indicated that she had been in the basement, which was the obvious source of fire. 1T. at 182-187, 189, 193, 213, 215.

{¶8} Inspector Reginald Winters of the Massillon Fire Department testified he ruled out an electrical shortage as the cause of the fire. Winters determined a mattress was the point of origination for the fire, and there were two distinct start points at separate ends of the mattress. Winters opined that the cause of the fire was incendiary, i.e., an open flame 1T. at 231. Thus, someone used an open flame to light two fires at different ends of the mattress. Winters did not find any evidence that the fire had been started by a cigarette, i.e., he did not find any remnant of a cigarette. 1T. at 239-240. There also did not appear to be any accelerants used in the fire. 1T. at 248; 2T. at 293-294.

**{¶9}** Because mattresses now have fire retardants on them, Inspector Winters testified that the initial flame would have been small, and that a glass of water would have extinguished the flame. The fire retardants cause any flame to burn slowly, not fast, and that a cigarette will take hours to light a mattress on fire. Fanning the fire would have given it oxygen, causing the flame to get bigger. Winters opined that the mattress at the Ayers residence burned between ten and twelve minutes before the fire department arrived. 2T. at 266-268.

**{¶10}** Winters testified that Bubba, if he had started the two fires, would have had to light the fire at one end of the mattress, and then crawl to the other end while the mattress was on fire to the other end and light that spot as well. 2T. at 303-305.

**{¶11}** In his official report, Inspector Winters reached the following conclusions about the fire:

> After examination of the fire scene it was determined the fire originated in the basement on the bed. After examination of the fire scene, interviewing witnesses, interviewing the insured and using the levels of scientific certainty as discussed in the 2011 edition of NFPA 921; A Guide for Fire and Explosion Investigation, it is my opinion the ignition source for the fire was some type of open flame. The materials first ignited were blankets on the bed. The act or omission that brought the ignition source and the materials first ignited together was the deliberate act of a person or persons. Using these elements of a fire cause, the cause of the fire is incendiary.

2T. at 300-301.

{¶12} Winters' report concluded the fire was not an accident.  1T. at 250. Investigator Winters prepared a draft report.  In that report, which he referred to as a template, he concluded the fire originated on the first floor of the residence.  Winters maintains this was a typographical error, and should have read the fire originated in the basement of the residence.  Additionally, the report contained several other errors not to be included in the final copy.  Winters stated in his testimony at trial, the report that had included the alleged errors was not the final report.  *State v. Ayers,* 5th Dist. Stark No. 2013 CA 00034, 2013-Ohio-5402, ¶9.

{¶13}  Ayers's defense centered upon the allegation her young son started the fire. Id. at 3.  The defense did not present any expert testimony during the jury trial.  After the fire, Ayers's son did not appear to have any smoke exposure or soot on his person. Ayers's appeared to have smoke exposure and tested positive for soot residue on her person.  Id. at ¶3.

{¶14}  Winters interviewed Ayers at the hospital where she had been taken due to the cut on her hand.  2T. at 260.  At the hospital, Ayers told Winters that she was in the basement folding clothes when she noticed Bubba was over by the mattress playing with a lighter.  Id. at 261; *Petition for Post-Conviction Relief,* filed May 18, 2020 at Exhibit F. Ayers did not respond when asked by Winters if she had attempted to take the lighter away from the child.  2T. at 262.  She was alerted to the fire when she saw a very small red glow.  Id.  She grabbed a blanket and began to attempt to smother the fire by beating it with the blanket.  Id.  When that only fanned the flames, Ayers said she attempted to get water from the washing machine to douse the fire.  Id. Ayers pours a glass of water on the flames; however, it failed to extinguish the fire.  2T. at 262-263.  She fell and cut

her hand while retrieving a second glass of water. Id. Ayers indicated that the child remained in the basement the entire time that she was trying to put out the fire. 2T. at 263.

{¶15} Once he had completed his investigation of the fire scene, Inspector Winters went to the Massillon Police Department to interview Ayers. This interview included Patrolman Curtis Rucker of the Massillon Police Department. 1T. at 198-200. The redacted portion of this interview was admitted into evidence during Ayers's jury trial as State's Exhibit 1. 2T. at 396-397.[2] In the interview, Ayers told the officers that she had been in the basement folding clothes. Ayers noticed Bubba standing next to the mattress. She did not notice anything in his hands. State's Exhibit 1. She shortly afterwards noticed a fire on the bed, so Ayers grabbed a blanket and starting fanning the flame. Unsuccessful in putting out the fire, Ayers claimed that she ran to the washing machine, grabbed a glass of water, and threw it on the flame. Unsuccessful yet again, she ran and got another glass of water, but tripped on her way back to the bed, dropping the glass and breaking it, and then falling on it and cutting her hand. The child remained in the basement with Ayers during the entire ordeal.

{¶16} Winters asked Ayers how she could see her son by the bed while she was folding clothes at the dryer since there was a chimney, a hot water tank, and a furnace blocking the view from that location. Ayers did not know. When asked why she told another officer that she might have fallen asleep, Ayers seem confused. State's Exhibit 1. Ayers denied ever threatening to burn the house down. She denied ever telling anyone that she had threatened to burn the house down. State's Exhibit 1. Ayers denied having

---

[2] This Court has reviewed State's Exhibit 1.

problems with her father.  She stated her father only asked her to move out when he was drunk.  When Ayers was shown the written statement that her father had given to the police stating that she had threatened to burn the house down, Ayers told the officers that her father was a liar and a terrible alcoholic, who has mistreated her since childhood. State's Exhibit 1; *Petition for Post-Conviction Relief,* filed May 18, 2020 at Exhibit H.

{¶17}  By the end of the interview, Ayers told the officers that she must have gone to sit on the bed to smoke a cigarette while she was waiting to change loads of laundry, and that she must have fallen asleep.  State's Exhibit 1.  Ayers denied that she had been drinking or using drugs, and told the investigators that she was only on Adderall for her ADHD.  When offered, Ayers declined a drug test.  State's Exhibit 1.

{¶18}  Winters spoke with Bubba, and noticed that the boy did not smell of smoke or soot, did not have any burn marks, and had no soot in his nostrils.  Winters did ascertain that the boy was able to light a lighter.  Winters then returned to the fire scene and found a broken glass in the basement.  He also found a blood splatter on the hot water tank and washing machine, and a blood trail that went up the basement steps, then back down, and that there was blood on the wall by the steps.  He also found blood in the kitchen and on the kitchen table.  2T. at 270-273.

{¶19}  Ayers was indigent.  The record contains no evidence that the defense requested the trial court provide funds to consult with an expert witness.  Ayers did not testify at trial or offer any evidence in her defense.

{¶20}  On November 6, 2012, Ayers was indicted on one count of Aggravated Arson, in violation of R.C. 2909.02(A)(2), a felony of the second degree, and one count of Endangering Children, in violation of R.C. 2919.22(A), a first-degree misdemeanor.

{¶21} The matter proceeded to a jury trial, and on January 30, 2013, Ayers was found guilty by a jury of both offenses. Ayers was sentenced to serve a prison term of seven years on the charge of Aggravated Arson and a concurrent sentence of one hundred eighty days on the charge of Endangering Children. This Court upheld Ayers's conviction and sentences. *State v. Ayers,* 5th Dist. Stark No. 2013 CA 00034, 2013-Ohio-5402. Ayers has served her prison term in this case.

{¶22} In June of 2013, Ayers filed a motion for appointment of counsel to represent her in a petition for post-conviction relief pursuant to R.C. 2953.21 claiming she wanted to obtain "additional evidence that was not presented on my behalf at the time of my trial." The court denied the request to appoint counsel. Ayers did not file a petition for post-conviction relief at that time.

{¶23} On May 7, 2014, Ayers pro se filed a Motion to Stay Execution and Collection of Court Costs. The trial court overruled the motion by Judgment Entry filed May 8, 2014. [Docket No. 93].

{¶24} On May 13, 2014, Ayers filed a pro se Motion to Stay Execution and Collection of Court Costs and an Affidavit of Indigency. [Docket No. 95]. The trial court overruled the motion by Judgment Entry filed May 14, 2014. [Docket No. 96].

{¶25} On May 28, 2015, Ayers filed pro se, "Defendant's Motion for Credit of Community Service Hours Earned Toward Payment of Fines, Court Costs, and/or Restitution," together with an attachment showing Ayers's 179 hours of community service earned in prison. [Docket No. 97]. The trial court overruled the motion by Judgment Entry filed May 29, 2015. [Docket No. 98].

{¶26} On October 19, 2015, Ayers filed pro se a "Motion for Modification of Sentence," together with a Memorandum in support. [Docket No. 99]. The trial court overruled the motion by Judgment Entry filed October 20, 2015. [Docket No. 100].

{¶27} On October 27, 2015, Ayers filed pro se a Motion to Reduce or Sentence, together with numerous attachments. [Docket No. 101]. The trial court overruled the motion by Judgment Entry filed October 27, 2015. [Docket No. 102].

{¶28} On November 9, 2015, Ayers sent a letter to the trial judge requesting a payment plan be established for her court costs. [Docket No. 103]. The trial court overruled the request by Judgment Entry filed November 18, 2015. [Docket No. 104].

{¶29} On March 4, 2016, Ayers wrote a letter to the judge asking to suspend the collection of her court costs until her release from prison. [Docket No. 105]. The trial court overruled the motion by Judgment Entry filed March 7, 2016. [Docket No. 106].

{¶30} On December 27, 2016, Ayers's aunt sent a letter to the judge to reduce or waive Ayers's court costs. [Docket No. 107].

{¶31} On January 6, 2017, Ayers sent a letter to the trial judge to reduce or waive Ayers's court costs. [Docket No. 108]. The trial court overruled the motion by Judgment Entry filed January 6, 2017. [Docket No. 109].

{¶32} On February 15, 2017, Ayers sent a letter to the trial judge to reduce or waive Ayers's court costs or establish a payment plan. [Docket No. 110]. The trial court overruled the motion by Judgment Entry filed February 15, 2017. [Docket No. 111].

{¶33} On February 12, 2018, Ayers filed pro se a Motion for Judicial Release, together with attachments and a request for a hearing. [Docket No. 112]. The trial court overruled the motion by Judgment Entry filed February 12, 2018. [Docket No. 113].

**{¶34}** On April 13, 2020, Ayers, through counsel, filed a Petition for Post-Conviction Relief Pursuant to R.C. 2953.21-23. ["PCR"] Ayers also filed a Motion for Leave to File for New Trial Pursuant to Crim.R 33(B) on April 13, 2020. Ayers filed her First Amended Petition for Post-Conviction Relief Pursuant to R.C. 2953.21-23 on May 18, 2020.

**{¶35}** Submitted in support of each motion, Ayers attached an affidavit from John Lentini. Mr. Lentini is one of the foremost forensic arson experts in the United States. In 2019, Mr. Lentini reviewed the 2013 testimony and summary conclusions of Inspector Winters and produced a report. According to Lentini's analysis, "the expert testimony presented to the jury by Mr. Winters was unreliable, unscientific, and at odds with generally accepted fire investigation methodology." Affidavit of John Lentini, ("Lentini Affidavit") attached as Exhibit O to Petition for Post-conviction Relief, ¶32. Specifically, Lentini concludes "unequivocally and to a reasonable degree of professional certainty" that,

> 1). "The proposition that this fire had two points of origin is unsupportable by any generally accepted methodology,"
>
> 2). "Mr. Winters used circular logic to conclude that the fire could not have been set by Ms. Ayers's son Brennan,"
>
> 3). "Despite claiming to follow NFPA 921, Mr. Winters disregarded its guidance in several important ways," and
>
> 4). "Mr. Winters demonstrated by his testimony that he is not qualified to investigate fires per NFPA 1033, the generally accepted industry standard."

Lentini Affidavit at ¶ 9.

{¶36} By Judgment Entry filed November 2, 2021, the trial court denied both of Ayers's motions. The trial court dismissed the PCR petition on jurisdictional grounds, finding the petition was not timely filed and did not fall within any exceptions of R.C. 2953.23(A). Further, the trial court found the claims in the PCR petition were barred by res judicata. Regarding Ayers's motion for leave to file a motion for new trial, the trial court found that she failed to make the requisite showing that she was unavoidably prevented from discovering the evidence she sought to present in a motion for new trial.

*Assignments of Error*

{¶37} Ayers raises two Assignments of Error,

{¶38} "I. THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR LEAVE TO FILE A MOTION FOR NEW TRIAL.

{¶39} "II. THE TRIAL COURT ERRED BY DENYING APPELLANT'S FIRST AMENDED PETITION FOR POSTCONVICTION RELIEF."

II.

{¶40} For ease of discussion, we will address Ayers's Assignments of Error out of sequence.

{¶41} In her Second Assignment of Error, Ayers argues that the trial court erred in overruled her untimely petition for post-conviction relief without a hearing.

**Petition for Post-Conviction Relief**

{¶42} R.C. 2953.21(A) states, in part, as follows: "(1) Any person who has been convicted of a criminal offense or adjudicated a delinquent child and who claims that there

was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief".

**{¶43}** A post-conviction proceeding is a collateral civil attack on a criminal conviction. *State v. Calhoun*, 86 Ohio St.3d 279, 281, 714 N.E.2d 905(1999); *State v. Phillips*, 9th Dist. No. 20692, 2002-Ohio-823. In order to obtain post-conviction relief, a petitioner must show that "there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States [.]" R.C. 2953.21; *State v. Watson*, 126 Ohio App.3d 316, 323, 710 N.E.2d 340 (12th Dist. 1998).

*Right to evidentiary hearing is not automatic*

**{¶44}** Under R.C. 2953.21, a petitioner seeking post-conviction relief is not automatically entitled to an evidentiary hearing. *Calhoun*, 86 Ohio St.3d at 282, 714 N.E.2d 905. Significantly, the Ohio Supreme Court has held that the proper basis for dismissing a petition for post-conviction relief without holding an evidentiary hearing include: 1) the failure of the petitioner to set forth sufficient operative facts to establish substantive grounds for relief, and 2) the operation of res judicata to bar the constitutional claims raised in the petition. *Calhoun*, 86 Ohio St.3d at paragraph two of the syllabus; *State v. Lentz*, 70 Ohio St.3d 527, 530, 639 N.E.2d 784(1994).

**{¶45}** In order for an indigent petitioner to be entitled to an evidentiary hearing in a post-conviction relief proceeding on a claim that he was denied effective assistance of

counsel, the two-part analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984) is to be applied. *Hill v. Lockhart*, 474 U.S. 52, 58, 106 S.Ct. 366, 88 L.Ed.2d 203(1985); *State v. Lytte*, 48 Ohio St.2d 391, 358 N.E.2d 623(1976); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373(1989); *State v. Cole, supra*, 2 Ohio St.3d at 114, 443 N.E.2d 169. The petitioner must therefore prove that: 1). counsel's performance fell below an objective standard of reasonable representation; and 2). there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. Id.

{¶46} R.C. 2953.21 does not expressly mandate a hearing for every post-conviction relief petition; therefore, a hearing is not automatically required. In determining whether a hearing is required, the Ohio Supreme Court in *State v. Jackson*, 64 Ohio St.2d 107, 413 N.E.2d 819(1980), stated the pivotal concern is whether there are substantive grounds for relief which would warrant a hearing based upon the petition, the supporting affidavits, and the files and records of the case. As the Supreme Court further explained in *Jackson*, "[b]road assertions without a further demonstration of prejudice do not warrant a hearing for all post-conviction relief petitions." Id. at 111, 413 N.E.2d 819. Rather, a petitioner must submit evidentiary documents containing sufficient operative facts to support his claim before an evidentiary hearing will be granted. Accordingly, "a trial court properly denies a defendant's petition for post-conviction relief without holding an evidentiary hearing where the petition, the supporting affidavits, the documentary evidence, the files, and the records do not demonstrate that petitioner set forth sufficient operative facts to establish substantive grounds for relief." *Calhoun*, 86 Ohio St.3d at paragraph two of the syllabus; see R.C. 2953.21(C).

**{¶47}** Furthermore, before a hearing is granted in proceedings for post-conviction relief upon a claim of ineffective assistance of trial counsel, the petitioner bears the initial burden to submit evidentiary material containing sufficient operative facts that demonstrate a substantial violation of any of defense counsel's essential duties to his client and prejudice arising from counsel's ineffectiveness. *Calhoun,* 86 Ohio St.3d at 289, 714 N.E.2d 905; *State v. Jackson*, 64 Ohio St.2d 107, 413 N.E.2d 819(1980), *syllabus; see, also Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674, 693(1984).

**{¶48}** "In determining how to assess the credibility of supporting affidavits in post-conviction relief proceedings, the Supreme Court adopted the reasoning of the First Appellate District in *State v. Moore*, 99 Ohio App.3d 748, 651 N.E.2d 1319(1st Dist. 1994), which had looked to federal habeas corpus decisions for guidance. Id. at 753-754, 651 N.E.2d at 1322-1323. The Supreme Court ultimately determined that the trial court should consider all relevant factors in assessing the credibility of affidavit testimony in 'so-called paper hearings,' including the following: '(1) whether the judge viewing the post-conviction relief petition also presided at the trial, (2) whether multiple affidavits contain nearly identical language, or otherwise appear to have been drafted by the same person, (3) whether the affidavits contain or rely on hearsay, (4) whether the affiants are relatives of the petitioner, or otherwise interested in the success of the petitioner's efforts, and (5) whether the affidavits contradict evidence proffered by the defense at trial. Moreover, a trial court may find sworn testimony in an affidavit to be contradicted by evidence in the record by the same witness, or to be internally inconsistent, thereby weakening the credibility of that testimony.' *Calhoun*, 86 Ohio St.3d at 285, 714 N.E.2d at 911-912*, citing*

*Moore,* 99 Ohio App.3d at 754-756, 651 N.E.2d at 1323-1324." *State v. Kinley*, 136 Ohio App.3d 1, 13-14, 735 N.E.2d 921, 930-31(2nd Dist. 1999). A trial court that discounts the credibility of sworn affidavits must include an explanation of its basis for doing so in its findings of fact and conclusions of law in order that meaningful appellate review may occur. Id. at 285, 735 N.E.2d 921, 714 N.E.2d at 911-912.

<em>Res Judicata</em>

**{¶49}** Another proper basis upon which to deny a petition for post-conviction relief without holding an evidentiary hearing is res judicata. *State v. Lentz,* 70 Ohio St.3d 527, 530, 1994-Ohio-532, 639 N.E.2d 784; *State v. Perry*, 10 Ohio St.2d 175, 39 O.O.2d 189, 226 N.E.2d 104(1967); *State v. Phillips,* 9th Dist. No. 20692, 2002-Ohio-823. Under the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment of conviction, or on an appeal from that judgment. *State v. Szefcyk*, 77 Ohio St.3d 93, 671 N.E.2d 233(1996), *syllabus, approving and following State v. Perry, 10 Ohio St.2d 175, 226 N.E.2d 104(1967), paragraph nine of the syllabus*. It is well settled that, "pursuant to res judicata, a defendant cannot raise an issue in a [petition] for post-conviction relief if he or she could have raised the issue on direct appeal." *State v. Reynolds*, 79 Ohio St.3d 158, 161, 679 N.E.2d 1131(1997).

**{¶50}** Similarly, regarding claims of ineffective assistance of trial counsel in post-conviction proceedings, the Ohio Supreme Court has stated that where a defendant, represented by different counsel on direct appeal, "fails to raise [in the direct appeal] the

issue of competent trial counsel and said issue could fairly have been determined without resort to evidence dehors the record, res judicata is a proper basis for dismissing defendant's petition for post-conviction relief." *State v. Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169(1982), syllabus; *see, also, Lentz*, 70 Ohio St.3d at 530, 639 N.E.2d 784; *State v. Phillips, supra.*

*Time requirements for filing*

**{¶51}** The pertinent jurisdictional time requirements for a post-conviction petition at the time of Ayers's direct appeal were set forth in R.C. 2953.21(A)(2) as follows,

A petition under division (A)(1) of this section shall be filed no later than one hundred eighty days after the date on which the trial transcript is filed in the court of appeals in the direct appeal of the judgment of conviction or adjudication * * *.

**{¶52}** In order for a court to recognize an untimely post-conviction petition, **both of the following requirements must apply** (R.C. 2953.23(A)(1)):

(a) Either the petitioner shows that the petitioner was *unavoidably prevented* from discovery of the facts upon which the petitioner must rely to present the claim for relief, or, subsequent to the period prescribed in division (A)(2) of section 2953.21 of the Revised Code or to the filing of an earlier petition, the United States Supreme Court recognized a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petition asserts a claim based on that right.

(b) The petitioner shows by clear and convincing evidence that, *but for constitutional error at trial, no reasonable factfinder would have found*

*the petitioner guilty of the offense of which the petitioner was convicted* or, if the claim challenges a sentence of death that, but for constitutional error at the sentencing hearing, no reasonable factfinder would have found the petitioner eligible for the death sentence. (Emphasis added).

**{¶53}** In the case at bar, Ayers agrees that her petition was filed outside the 180-day time limit in effect at the time of her conviction.

**Standard of Review – Untimely petition for Post-Conviction Relief**

**{¶54}** A post-conviction proceeding is a collateral civil attack on the judgment, *State v. Calhoun,* 86 Ohio St.3d 279, 281, 714 N.E.2d 905 (1999), and the "right to file a post-conviction petition is a statutory right, not a constitutional right," *State v. Broom*, 146 Ohio St.3d 60, 2016-Ohio-1028, 51 N.E.3d 620, ¶ 28. A post-conviction petitioner therefore "receives no more rights than those granted by the statute." *Calhoun* at 281, 714 N.E.2d 905. This means that any right to post-conviction relief must arise from the statutory scheme enacted by the General Assembly.

**{¶55}** That includes the right to have one's claim heard at all: R.C. 2953.23(A) provides that "a court *may not entertain* a petition filed after the expiration of the period prescribed in [ R.C. 2953.21(A)] or a second petition or successive petitions for similar relief on behalf of a petitioner *unless*" one of the exceptions in R.C. 2953.23(A) applies. (Emphasis added.) *State v. Apanovitch,* 155 Ohio St.3d 358, 2018-Ohio-4744, 121 N.E.3d 351, ¶ 36. Therefore, a petitioner's failure to satisfy R.C. 2953.23(A) deprives a trial court of jurisdiction to adjudicate the merits of an untimely or successive post-conviction petition. *Apanovitch* at ¶ 36.

**{¶56}** Accordingly, given the substance of Ayers's allegations, for the trial court to have subject-matter jurisdiction to consider the petition, Ayers had to show (1) that she was "unavoidably prevented from discovery of the facts" upon which her claim relies *and* (2) by clear and convincing evidence, that no reasonable fact-finder would have found her guilty or eligible for the death sentence but for the constitutional error at trial. R.C. 2953.23(A)(1). *See State v. Apanovitch*, 155 Ohio St.3d 358, 2018-Ohio-4744, 121 N.E.3d 351, ¶ 36. *State v. Bethel,* __Ohio St.3d ___, 2022-Ohio-783, __N.E.3d__, ¶20.

**{¶57}** We review de novo whether the trial court had subject-matter jurisdiction to entertain Ayers's petition. *Apanovitch* at ¶ 24; *Bethel* at .¶20.

**{¶58}** We must first decide does the post-conviction petition satisfy an exception provided in R.C. 2953.23(A). *State v. Apanovitch*, 155 Ohio St.3d 358, 2018-Ohio-4744, 121 N.E.3d 351, ¶ 23.

*"[U]navoidably prevented from discovery of the facts"*

**{¶59}** For the trial court to have jurisdiction to entertain the ineffective assistance of trial counsel claim alleged in the post-conviction petition, Ayers first had to establish that she was "unavoidably prevented from discovery of the facts" on which she relies. R.C. 2953.23(A)(1)(a). To meet this standard, courts in Ohio have previously held that a defendant ordinarily must show that he was unaware of the evidence he is relying on and that he could not have discovered the evidence by exercising reasonable diligence. Bethel, at ¶21 *citing State v. Harrison*, 8th Dist. Cuyahoga No. 105909, 2018-Ohio-1396, 2018 WL 1778661, ¶ 6.

**{¶60}** We find it unnecessary to reach this issue because even if we assume arguendo that Ayers was "unavoidably prevented from discovery of the facts" on which

she relies, Ayers must also show by clear and convincing evidence that no reasonable fact-finder would have found her guilty but for constitutional error at trial. *Apanovitch,* 155 Ohio St.3d at ¶26.

*No reasonable fact-finder would have found Ayers guilty but for the constitutional*

*error at trial*

{¶61} Ayers's post-conviction petition faces an additional jurisdictional hurdle: under R.C. 2953.23(A)(1)(b). Therefore, we must first decide whether a constitutional error occurred during Ayers's jury trial. If a constitutional error occurred, we must then find by clear and convincing evidence that no reasonable fact-finder would have found her guilty but for constitutional error at trial. This question goes to the heart of the second prong of the *Strickland- Brady* test for claims of ineffective assistance of counsel, which requires Ayers to show that is there is a reasonable probability that but for counsel's unprofessional errors, the result of her trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373(1989). In *Harrington v. Richter,* the United States Supreme Court discussed the prejudice prong of the *Strickland* test,

> A reasonable probability is a probability sufficient to undermine confidence in the outcome." *[Strickland*], at 694, 104 S.Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693, 104 S.Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687, 104 S.Ct. 2052.

562 U.S. 86, 104,131 S.Ct. 770, 178 L.Ed.2d 624(2011).

**Substantive Claims**

*First Ground for Relief*

**{¶62}** In the First Count of her petition for post-conviction relief Ayers contends that she was denied effective assistance of counsel. Specifically, Ayers contends 1). Defense counsel failed to consult with an expert witness regarding the origin of the fire; 2). Defense counsel failed to challenge false and unsupported testimony offered by the state's expert; and 3). Defense counsel failed to object to testimony that should have been barred under Ohio Crim.R.16(K).

*1). Failure to consult with an expert.*

**{¶63}** In support of her contention that she was denied effective assistance of counsel because her trial attorney did not consult with an expert witness, Ayers submitted the affidavit of John J. Lentini, a renowned forensic arson expert. Lentini concludes "unequivocally and to a reasonable degree of professional certainty" that:

1). "The proposition that this fire had two points of origin is unsupportable by any generally accepted methodology,"

2). "Mr. Winters used circular logic to conclude that the fire could not have been set by Ms. Ayers's son Brennan,"

3). "Despite claiming to follow NFPA 921, Mr. Winters disregarded its guidance in several important ways," and

4). "Mr. Winters demonstrated by his testimony that he is not qualified to investigate fires per NFPA 1033, the generally accepted industry standard."

Lentini Affidavit at ¶ 9. Mr. Lentini is highly critical of the state's expert Fire Inspector Reginal Winters.

**{¶64}** At trial Fire Inspector Winters testified concerning his knowledge and experience as follows,

Q.    How long have you been a Fire Inspector/Fire Investigator?

A.    I've been - - five years with the City of Massillon, been on the fire department for ten.

Q.    And prior to your employment at the City of Massillon, were you employed elsewhere as a firefighter?

A.    Yes, sir, fifteen years with the City of Orrville.

Q.    Now, if you would, could you tell these ladies and gentlemen what a fire inspector's duties are?

A.    Fire inspector's duties are we do public safety. We also go through commercial buildings ensuring safety, making sure the fire extinguishers, exit lights are lit, and we also give approval for new buildings and stuff like that. We work with the building department. We also are in charge of fireworks, certifying them and stuff like that, to inspect the site to make sure it's safe for the community.

Q.    How about the other part of your job description that you previously entail detailed that you had, would you explain that to these folks?

A.     As a Fire Investigator, my job is to come in and determine origin and cause.  The cause being what happened, the origin is where the fire started at.

Q.     Did you have to undergo specialized training in order to hold a position as that of which you just described?

A.     Yes, sir.

A.     What type of training, first of all, did you have to undergo?

A.     First of all, I had to get my certified Fire Inspector.  You have to be a certified Fire Inspector.  And then from there you have to - - it's two stages.  You have a basic Fire Investigator and then you have an advanced Fire Inspector course you have to take.

Q.     Let's talk about the certified Fire Inspector training first.  What does that entail?

A.     That entails looking at multiple burn scenes, learning the scientific methodology of how different things burn as far as oils, gas, electrical fires, the synthetic fires as far as people using open flames to fires, candles, paper.  And we look at the different patterns the fire makes, the different charring of wood and stuff like that to make our determination whether - - what caused the fire, whether it was mechanical, accidental, or incendiary.

Q.     Do you have to go to classes for that?

A.     Yes, sir.

Q.     And how long were those classes?

A.      My first class as a basic investigator, it was 32 hours.  The second part of advanced was - - it was 40 hours.

Q. Did you successfully complete all those classes?

A.      Yes, sir.

Q.      And then at the end of those classes, do you have to take a test?

A.      Yes, sir.

Q.      And did you successfully pass all those tests?

A.      Yes, sir.

Q.      So, you are now a certified arson Investigator?

A.      Yes.

Q.      And that's within the State of Ohio?

A.      Yes, sir.

Q.      Once you complete that training, do you have to continue to update your education?

A.      Yes, sir.

Q.      What do you have to do?

A.      We have to - - well, we take like different seminars.    One seminar I attend is the International Firefighters Association of Arson Investigators in Columbus.    It's an annual Fire Investigator course weeklong.   We have to maintain 32 hours in a three-year period of continuing education.

Q.      And as you sit here today, are you current in all your requirements to be a certified arson investigator?

A.      Yes, sir.

Q.      You indicated that you've held that position with the Massillon Police [sic] Department for five years.     Could you estimate the number of fires you've investigated within those five years?

A.      I would say approximately  30.

Q.      And have you testified before in the courts of Stark County as an expert in the cause and origin of fires?

A.      Yes, sir.

Q.      And has that testimony been accepted by the courts?

A.      Yes, sir.

1T. at 225-229.

{¶65}  In *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, the Supreme Court observed,

Neither special education nor certification is necessary to confer expert status upon a witness.  "The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function."  *State v. Hartman,* 93 Ohio St.3d at 285, 754 N.E.2d 1150; *State v. Baston,* 85 Ohio St.3d 418, 423, 709 N.E.2d 128.  *Pursuant to Evid.R. 104(A), the trial court determines whether a witness qualifies as an expert*, and that determination will be overturned only for an abuse of discretion.

> *State v. Hartman,* 93 Ohio St.3d at 285, 754 N.E.2d 1150; *State v.*
>
> *Williams* (1983), 4 Ohio St.3d 53, 58, 4 OBR 144, 446 N.E.2d 444.

Id. at ¶46 (emphasis added). Ayers does not argue in her petition for post-conviction relief that the trial court abused its discretion by qualifying Fire Inspector Winters as an expert witness.

**{¶66}** In the case at bar, the undisputed facts at trial were that a fire occurred on a mattress located in the basement that caused damage to the residence. The disputed facts at trial were whether Ayers stared the fire intentionally or accidentally, or, whether the 3-year-old child started the fire.

**{¶67}** Mr. Lentini's affidavit does not exonerate Ayers or reduce her culpability. In other words, Mr. Lentini does not opine that 1). the fire was of accidental origin; 2). a person could not have intentionally started the fire; or 3). having only one ignition point rules out that the fire was started intentionally. To answer those questions the jury must necessarily look to the other evidence present by the state during Ayers's jury trial.

**{¶68}** Ayers's father testified he had previously discussed finances with her, and the fact she had not been contributing to the household financial situation. Mr. Ayers told Ayers that he was planning to move to West Virginia. Jeff Ayers testified that Ayers became more aggressive toward him and began to make threats to the point that he feared for the safety of his family. 1T. at 309-310. Jeff Ayers testified that Ayers threatened to burn the house down. Id. He became so concerned that he called his sister, aunt and the landlord and told them that Ayers was threatening to burn the house

down.  1T. at 310.  The fire occurred on the day that he left the home for West Virginia.  1T. at 312.

**{¶69}**  Additionally, a neighbor of Ayers, Jason Pandrea, testified he heard Ayers threaten her father with burning the house down if he ever left.  1T. at 339.  Pandrea testified that Ayers "meant it."  1T. at 341.

**{¶70}**  The jury viewed the video of Ayers's statement to Fire Inspector Winters and Patrolman Curtis Rucker from the Massillon Police Department.  1T. at 195; 201.  State's Exhibit 1.  The jury was shown pictures of the scene after the fire had occurred.

**{¶71}**  Inspector Reginald Winters was the state's expert.  1T. at 225.  Winters did not find evidence of a cigarette as the cause of the fire.  1T. at 240.  Winters identified the State's Photograph Exhibits that he took of the scene of the fire.  1T. at 243; 2T. at 273, 275.  Winters was able to exclude cigarettes, natural gas, accelerants, and an electrical cause for the fire.  1T. at 248- 249.  Winters testified the cause of the fire was incendiary (open flame) and a person or persons started the fire.  1T. at 250.

**{¶72}**  The jury heard Ayers's statement to Massillon Paramedic Richard Annen that she was running upstairs to get her son when the fire started in the basement.  1T. at 186.  Ayers initially told Annen that the child started the fire; however, she later claimed that she might have fallen asleep.  1T. at 206-207.  Annen looked in the child's mouth and on his face and found no evidence of soot, which would indicate that the child had been near the fire.  Id. at 185.  He found evidence of soot on Ayers.  1T. at 186-187.

**{¶73}**  At the hospital, Ayers claimed to be in the basement folding clothes when she noticed her son playing with a lighter on the mattress.  2T. at 261.  When asked how she could see a small fire on the bed with the chimney, hot water tank and furnace

blocking her view from her position near the clothes dryer she was unable to answer. 2T. at 263.

{¶74} The jury also had audio recordings of calls made by Ayers while she was in jail. Exhibit 2. This Court notes that State's Exhibit 2 is a disk containing 34 phone calls that Ayers made from the jail while she was awaiting trial. However, only "snippets" from two calls were played for the jury and admitted into evidence. 2T. at 397-398. The state never identified the specific portion of the calls that were played for the jury and admitted into evidence.

{¶75} It is not unusual in a case in which highly technical, medical or other specialized evidence is presented for the experts presented by each party to criticize the other's training, methodology, and/or conclusions. When a so-called "battle of experts" takes place during a jury trial such criticisms go to the weight not the admissibility of each expert's opinion. An expert witness is not required to be the best witness on the subject. *Alexander v. Mt. Carmel Med. Ctr.*, 56 Ohio St.2d 155, 159, 383 N.E.2d 564(1978). (Citations omitted.)

{¶76} The majority of Lentini's opinion centers on his belief that Winters is not qualified, or did not use the techniques that Lentini believes are the best practice. When viewed in this light, Lentini's affidavit has only limited probative value. His opinion does not exonerate Ayers or reduce her culpability. He opines only that Fire Inspector Winters's expert testimony was "unreliable, unscientific, and at odds with generally accepted fire investigation methodology." Lentini Affidavit at ¶32. Lentini's opinion does not affect the other testimony and evidence that was presented during Ayers's jury trial.

{¶77} In light of the evidence produced that did not depend upon expert testimony and the entire record in this case, we hold that Ayers has not shown a reasonable probability that but for counsel's unprofessional errors, the result of her trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373(1989). The testimony of Lentini could not reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Ayers was not denied her right to due process and fair trial by counsel's failure to consult an expert witness.

*2). Defense counsel failed to challenge false and unsupported testimony offered by the state's expert &* 3). *Defense counsel failed to object to testimony that should have been barred under Ohio Crim.R.16(K).*

{¶78} Ayers next argues that she received ineffective assistance of trial counsel because defense counsel did not object or otherwise challenge Fire Inspector Winters's testimony.

{¶79} In her direct appeal, Ayers raised the following Assignment of Error,

"II. THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DUE TO TRIAL COUNSEL'S FAILURE TO REVIEW THE APPROPRIATE DISCOVERY MATERIALS IN PREPARATION FOR TRIAL."

*State v. Ayers,* 5th Dist. Stark No. 2013 CA 00034, 2013-Ohio-5402, ¶15.

{¶80} We further note that counsel's failure to object to Fire Inspector Winters's testimony is evident from the record. The entire Executive Summary prepared by Winters was read into the record during the jury trial. 2T. at 297. Defense counsel acknowledged

receiving the report. Id. at 299. The report does not indicate the fire had two points of origin. 2T. at 297. Ayers was indigent. The record contains no evidence that the defense requested the trial court provide funds to consult with an expert witness.

**{¶81}** In the case at bar, Ayers was represented in her direct appeal by new counsel. Counsel in that appeal could have cited to the testimony and records contained in the court file to support a claim of ineffective assistance of trial counsel in failing to object or challenge Fire Inspector Winters's testimony. To overcome the *res judicata* bar, the evidence must show that the petitioner could not have appealed the constitutional claim based on the information in the original trial record. *State v. Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169 (1982), syllabus. Ayers has failed in this burden.

**{¶82}** As Ayers could have raised and fully litigated this issue on direct appeal, this court concludes that the trial court did not err in finding that trial counsel's failure to object or challenge Fire Inspector Winters's testimony is barred by *res judicata.*

*Second Ground for Relief*

**{¶83}** In her Second Ground for Relief, Ayers claims the prosecutor committed misconduct by failing to disclose Fire Inspector Winters's conclusion that the fire had two point of origin in violation of Crim.R. 16(K).

**{¶84}** The entire Executive Summary prepared by Winters was read into the record during the jury trial. 2T. at 297. Defense counsel acknowledged receiving the report. Id. at 299. The report does not indicate the fire had two points of origin. 2T. at 297.

**{¶85}** In the case at bar, Ayers was represented in her direct appeal by new counsel. Counsel in that appeal could have cited to the testimony and records contained

in the court file to support a claim of ineffective assistance of trial counsel in failing to object or challenge the state's failure to disclose Fire Inspector Winters's testimony concerning the fire's two points of origin. Ayers was indigent. The record contains no evidence that the defense requested the trial court provide funds to consult with an expert witness.

**{¶86}** To overcome the *res judicata* bar, the evidence must show that the petitioner could not have appealed the constitutional claim based on the information in the original trial record. *State v. Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169 (1982), syllabus. Ayers has failed in this burden.

**{¶87}** As Ayers could have raised and fully litigated this discovery issue on direct appeal, this Court concludes that the trial court did not err in finding that this issue was barred by *res judicata.*

*Third Ground for Relief*

**{¶88}** In the Third Ground for Relief set forth in Ayers's petition for post-conviction relief, Ayers contends that her right to compulsory process was violated by the state's discovery violation, i.e. failing to disclose Fire Inspector Winters's conclusion that the fire had two point of origin in violation of Crim.R. 16(K).

**{¶89}** Defense counsel was in possession of Fire Inspector Winters's Executive Summary, and his draft report prior to trial. Thus, the defense was on notice that the state would present expert testimony prior to trial. Nothing impeded the defense from obtaining its own expert witness. The proffered testimony of Ayers's attorneys submitted, as Exhibit L to her petition, does not indicate that her trial attorneys would have retained an expert

witness had they received Fire Inspector Winters's conclusion that the fire had two points of origin before trial.

{¶90} The entire Executive Summary prepared by Winters was read into the record during the jury trial. 2T. at 297. Defense counsel acknowledged receiving the report. Id. at 299. The report does not indicate the fire had two points of origin. 2T. at 297.

{¶91} In the case at bar, Ayers was represented in her direct appeal by new counsel. Counsel in that appeal could have cited to the testimony and records contained in the court file to support a claim of ineffective assistance of trial counsel in failing to object or challenge Fire Inspector Winters's testimony, or to retain and present its own expert at trial. To overcome the *res judicata* bar, the evidence must show that the petitioner could not have appealed the constitutional claim based on the information in the original trial record. *State v. Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169 (1982), syllabus. Ayers has failed in this burden. The issue of whether Ayers was denied compulsory process by the state's failure to disclose Fire Inspector Winters's conclusion that the fire had two points of origin before trial could have been raised in her direct appeal.

{¶92} As Ayers could have raised and fully litigated this issue on direct appeal, this Court concludes that the trial court did not err in finding that this issue was barred by *res judicata.*

*Fourth Ground for Relief*

{¶93} In the Fourth Ground for Relief Ayers asserts a claim of actual innocence.

{¶94} Ayers does not assert a claim of actual innocence based upon DNA evidence as set forth in R.C. 2953.23(A)(2).

{¶95} The United States Supreme Court has ruled that under the United States Constitution, an actual-innocence claim "is not itself a constitutional claim," *Herrera v. Collins,* 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). *Accord, State v. Apanovitch,* 155 Ohio St.3d 358, 2018-Ohio-4744, 121 N.E.3d 351, ¶26. In *State v. Willis,* the Court explained,

> In *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), the United States Supreme Court held that "a claim of 'actual innocence' is not itself a constitutional claim." Id. at 404, 113 S.Ct. 853. "[A] claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Nevertheless, the court was willing to "assume, for the sake of argument in deciding [the] case, that a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." Id.
>
> Interpreting *Herrera, supra*, the First District Court of Appeals held that a petitioner was not entitled to post-conviction relief unless he showed a violation of rights that were constitutional in dimension, which occurred at the time that the petitioner was tried and convicted. *State v. Campbell*, 1st Dist. Hamilton No. C–950746, 1997 WL 5182 (Jan. 8, 1997). The court stated:

[N]ewly discovered evidence is, by definition, that "which the defendant could not with reasonable diligence have discovered and produced at trial." Crim.R. 33(A)(6); * * * A claim of actual innocence based on newly discovered evidence will, therefore, not provide substantive grounds for post-conviction relief, because "it does not, standing alone, demonstrate a constitutional violation in the proceedings that actually resulted in the conviction." * * * Campbell's claims of actual innocence were thus not cognizable in a postconviction proceeding. *Citing State v. Powell*, 90 Ohio App.3d 260, 264, 629 N.E.2d 13 (1993).

Other Ohio courts have similarly held that a claim of actual innocence does not constitute a substantive ground for post-conviction relief. *State v. Bound,* 5th Dist. Guernsey No. 04 CA 8, 2004-Ohio-7097, 2004 WL 2988294, *State v. Wat*son, 126 Ohio App.3d 316, 323, 710 N.E.2d 340 (12th Dist. 1998), *State v. Loza*, 12th Dist. Butler No. CA96–10–214, 1997 WL 634348 (Oct. 13, 1997).

6th Dist. Lucas Nos. L-15-1098, L-15-1101, 2016-Ohio-335, 58 N.E.3d 515, ¶15-¶17.

**{¶96}** We further note that this Court has previously found that Ayers's convictions are not against the weight or the sufficiency of the evidence. *State v. Ayers,* 5th Dist. Stark No. 2013 CA 00034, 2013-Ohio-5402, ¶26.

**{¶97}** Accordingly, the trial court did not abuse its discretion in denying Ayers's petition based on actual innocence.

*Fifth Ground for Relief*

**{¶98}** In her Fifth Claim for Relief, Ayers argues that but for Fire Inspector Winters's false, unsupported and/or materially misleading testimony she would not have been convicted.

**{¶99}** It is not unusual in a case in which highly technical, medical or other specialized evidence is presented for the experts presented by each party to criticize the other's training, methodology, and/or conclusions.  When a so-called "battle of experts" takes place during a jury trial such criticisms go to the weight not the admissibility of each expert's opinion.

**{¶100}** An expert witness is not required to be the best witness on the subject. *Alexander v. Mt. Carmel Med. Ctr.*, 56 Ohio St.2d 155, 159, 383 N.E.2d 564(1978). (Citations omitted.)  In *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, the Supreme Court observed,

> Neither special education nor certification is necessary to confer expert status upon a witness.  "The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function."  *State v. Hartman,* 93 Ohio St.3d at 285, 754 N.E.2d 1150; *State v. Baston,* 85 Ohio St.3d 418, 423, 709 N.E.2d 128.  *Pursuant to Evid.R. 104(A), the trial court determines whether a witness qualifies as an expert*, and that determination will be overturned only for an abuse of discretion. *State v. Hartman,* 93 Ohio St.3d at 285, 754 N.E.2d 1150; *State v. Williams* (1983), 4 Ohio St.3d 53, 58, 4 OBR 144, 446 N.E.2d 444.

Id. at ¶46 (emphasis added).

{¶101}When viewed in this light, Lentini's affidavit has only limited probative value. His opinion does not exonerate Ayers. The majority of Lentini's opinion centers on his belief that Winters is not qualified, or did not use the techniques that Lentini believes are the best practice. He opines only that Fire Inspector Winters's expert testimony was "unreliable, unscientific, and at odds with generally accepted fire investigation methodology." Lentini Affidavit at ¶32. Lentini's opinion does not affect the other testimony and evidence that was presented during Ayers's jury trial. Mr. Lentini does not opine: 1). the fire was of accidental origin; 2). a person could not have intentionally started the fire; or 3). having only one ignition point rules out that the fire was started intentionally. To answer those questions the jury must necessarily look to the other evidence present by the state during Ayers's jury trial.

{¶102} In light of the evidence produced that did not depend upon expert testimony and the entire record in this case, we hold that Ayers has not shown a reasonable probability that but for counsel's unprofessional errors, the result of her trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373(1989). The testimony of Lentini could not reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Ayers was not denied her right to due process and fair trial by Fire Inspector Winters's testimony.

{¶103} We further note that this Court has previous found that Ayers's convictions are not against the weight or the sufficiency of the evidence. *State v. Ayers,* 5th Dist. Stark No. 2013 CA 00034, 2013-Ohio-5402, ¶26.

*Sixth Ground for Relief*

{¶104} In her Sixth Ground for Relief Ayers recasts her previous arguments as well as asserting due process and cruel and unusual punishment claims under the Ohio Constitution.

{¶105} The claims under the state constitution fail for the reasons set forth above in our disposition of Ayers's First through Fifth Grounds for Relief.

**Conclusion – Post conviction relief**

{¶106} In *Harrington v. Richter,* the United States Supreme Court discussed the prejudice prong of the *Strickland* test,

> A reasonable probability is a probability sufficient to undermine confidence in the outcome." *[Strickland]*, at 694, 104 S.Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693, 104 S.Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687, 104 S.Ct. 2052.

562 U.S. 86, 104,131 S.Ct. 770, 178 L.Ed.2d 624(2011).

{¶107} In light of the evidence produced that did not depend upon expert testimony and the entire record in this case, we hold that Ayers has not shown a reasonable probability that but for counsel's unprofessional errors, the result of her trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373(1989).

{¶108} Accordingly, we hold that Ayers has not shown by clear and convincing evidence that a constitutional error occurred during her jury trial, and that no reasonable

fact-finder would have found her guilty but for the constitutional error at trial. R.C. 2953.23(A)(1)(b).

{¶109} Therefore, the trial court correctly concluded that it lacked jurisdiction to consider Ayers's untimely petition for post-conviction relief.

{¶110} Ayers's Second Assignment of Error is overruled.

### I. & III.

{¶111} In her First Assignment of Error, Ayers maintains that she relied upon her trial attorneys to discover and investigate evidence necessary to prepare her defense at trial and her reliance upon her attorneys unavoidably prevented her from discovering both the flaws in the state's arson theory and her lack of a fair trial.

{¶112} In Ayers's Third Assignment of Error, she claims that the trial court erred by denying her a hearing on her motion for leave because she presented a "prima facie" showing of unavoidable delay under Crim.R.33(B).

### Standard of Appellate Review.

{¶113} Crim.R. 33(B) provides that if a defendant fails to file a motion for a new trial within 120 days of the jury's verdict, he or she must seek leave from the trial court to file a delayed motion. Crim.R. 33(B) does not give a deadline by which a defendant must seek leave to file a motion for a new trial based on the discovery of new evidence. *State v. Bethel,* __Ohio St.3d __, 2022-Ohio-783, __N.E.3d ___, ¶53, ¶55.

{¶114} To obtain leave, the defendant must show by clear and convincing proof that he or she was unavoidably prevented from discovering the evidence within the 120 days. *State v. Lordi*, 149 Ohio App.3d 627, 2002–Ohio–5517, 778 N.E.2d 605(7th Dist.), ¶ 26–27. Clear and convincing proof is that which will produce in the mind of the trier of

fact a firm belief or conviction as to the facts sought to be established. *In re Adoption of Holcomb,* 18 Ohio St .3d 361, 368, 481 N.E.2d 613(1985); *Lordi, supra*, at ¶ 26.

{¶115} A party is unavoidably prevented from filing a motion for new trial if the party had no knowledge of the existence of the ground supporting the motion for new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence. *State v. Bethel,* 2022-Ohio-783, ¶21.

{¶116} "To warrant the granting of a motion for a new trial on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result of a new trial if granted; (2) has been discovered since the trial; (3) is such as could not in the exercise of due diligence have been discovered before the trial; (4) is material to the issues; (5) is not merely cumulative to former evidence; and (6) does not merely impeach or contradict the former evidence." *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370(1947), syllabus. *Accord*, *State v. Hawkins*, 66 Ohio St.3d 339, 350, 612 N.E.2d 1227(1993), syllabus; *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶85. A trial court abuses its discretion in granting a defendant a new trial without first finding by clear and convincing evidence that the defendant was unavoidably prevented from discovering the evidence within the one hundred twenty-day time frame established by Crim.R. 33(B). *State v. Georgekopoulos*, 9th Dist. Summit No. C.A. 21952, 2004-Ohio-5197, ¶8.

{¶117} The decision whether to grant a new trial on grounds of newly discovered evidence falls within the sound discretion of the trial court. *State v. Hawkins*, 66 Ohio St.3d at 350, 612 N.E.2d 1227. We cannot reverse unless there has been a gross abuse

of that discretion, and whether that discretion has been abused must be disclosed from the entire record. *State v. Petro,* 148 Ohio St. at 507- 508, 76 N.E.2d 370, *quoting State v. Lopa*, 96 Ohio St. 410, 411, 117 N.E. 319(1917).

{¶118} Trial courts should subject Crim.R. 33(A)(6) new trial motions to the closest scrutiny:

Applications for new trials on the ground of newly discovered evidence are not, however, favored by the courts, for the reason that the moving party has generally had ample opportunity to prepare his case carefully and to secure all of the evidence before the trial. Such applications, whether in a court of law or in a court of equity, are entertained with reluctance and granted with caution, not only because of the danger of perjury, but also because of the manifest injustice in allowing a party to allege that which may be the consequence of his own neglect in order to defeat an adverse verdict. In order to prevent, as far as possible, the fraud and imposition which defeated parties may be tempted to practice as a last resort to escape the consequence of an adverse verdict, an application setting up the discovery of new evidence should always be subjected to the closest scrutiny by the court. The applicant is required to rebut the presumption that the verdict is correct and that there has been a lack of due diligence and to establish other facts essential to warrant the granting of a new trial upon the ground of newly discovered evidence. The rule to be deduced from the cases is that where newly discovered evidence is of such conclusive nature, or of such decisive or preponderating character, that it

would with reasonable certainty have changed the verdict or materially reduced the recovery, a new trial should be granted if it is satisfactorily shown why the evidence was not discovered and produced at the time of the trial.

*Taylor v. Ross*, 150 Ohio St. 448, 450–51, 83 N.E.2d 222, 224 (1948), *quoting* 39 American Jurisprudence, 163, Section 156; *accord Domanski v. Woda*, 132 Ohio St. 208, 6 N.E.2d 601 (1937).

**{¶119}** "The question of whether to decide a motion on the supporting evidence filed with the motion or to hold an evidentiary hearing is within the discretion of the trial court." *United States v. O'Dell*, 805 F.2d 637, 643 (6th Cir.1986); *State v. Sutton*, 2016-Ohio-7612, 73 N.E.3d 981, ¶ 13 (8th Dist.).

**Issue for Appellate Review:** *Whether the trial court abused its discretion in denying Ayers's motion for leave to file a motion for a new trial filed beyond 120 days of the jury's verdict without a hearing.*

**{¶120}** For the trial court to have jurisdiction to entertain the ineffective assistance of trial counsel claim alleged in the motion for leave to file a motion for a new trial, Ayers first had to establish that she was "unavoidably prevented from discovery of the facts" on which she relies.

**{¶121}** We find it unnecessary to reach this issue. Assuming arguendo that Ayers would be entitled to a hearing on her motion for leave to file a motion for a new trial, the hearing would be an exercise in futility. We have concluded in our discussion of Ayers's petition for post-conviction relief, Assignment of Error 2, supra, that, in light of the evidence produced at Ayers's jury trial that did not depend upon expert testimony, and

the entire record in this case, Ayers has not shown a constitutional error occurred during her jury trial and that no reasonable fact-finder would have found her guilty but for the constitutional error at trial.  R.C. 2953.23(A)(1)(b).

**{¶122}** Because Ayers's failed to meet her burden under R.C. 2953.23(A)(1)(b), Ayers's motion for a new trial would be without merit, therefore rendering moot a hearing on her motion for leave to file a motion for a new trial.  *State v. Bethel,* __Ohio St.3d __, 2022-Ohio-783, __N.E.3d ___, ¶59 - ¶60.  Therefore, the trial court did not abuse its discretion in overruling Ayers's motion for leave to file a motion for a new trial without holding an evidentiary hearing on the motion.

**{¶123}** Ayers's First and Third Assignments of Error are overruled.

**{¶124}** For the foregoing reasons, the judgment of the Stark County Court of Common Pleas is affirmed.

By Gwin, J.,

Wise, Earle, P.J., and

Hoffman, J., concur